UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE GARRETT,<br><br>    Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA , N.A., et al.,<br><br>    Defendants. | Case No.  13-cv-05263-JST<br><br>**ORDER GRANTING MOTION TO REMAND**<br><br>ECF No. 16 |

## I. INTRODUCTION

Plaintiff brings this Motion to Remand her complaint to Alameda Superior Court, arguing that Defendant Bank of America ("BANA") has failed to demonstrate that this Court has subject-matter jurisdiction over her putatively state-law cause of action. BANA opposes this motion and has also filed a separate Motion to Dismiss. The matter came for hearing on March 7, 2014.

## II. BACKGROUND

### A. Factual & Procedural History

On October 11, 2013, Plaintiff Nicole Garrett ("Garrett"), a former bank teller employed by BANA, filed suit against Defendant Bank of America ("BANA") in Alameda Superior Court alleging that BANA has violated California's labor law provisions that require employers to provide seats for their workers. 8 Cal. Code Reg. § 11070(14); Plaintiff's Memorandum of Points and Authorities ("MPA") at 1-2, ECF No. 16-1. Garrett's complaint brings a single "representative" cause of action under California's Private Attorney General Act ("PAGA"), Cal. Labor Code § 2698 *et. seq.* MPA at 1-2. On November 13, 2013, BANA removed the complaint to this Court. Id. at 2. On November 22, 2013, Garrett filed a Motion to Remand the case back to the Alameda Superior Court. Plaintiff's Motion to Remand ("Mot. "), ECF. No. 16. On the same

date, BANA filed a Motion to Dismiss based on the First-to-File Rule. Defendant's Motion to Dismiss ("Mot. Dismiss"), ECF No. 15.

Since the Motion to Remand presents "a threshold jurisdictional question," the Court must "decide it first," before addressing the Motion to Dismiss. Lowry v. Barnhart, 329 F.3d 1019, 1022 (9th Cir. 2003) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

### B. Legal Standard

"[A]ny civil action brought in a[s]tate court of which the district courts of the United States have original jurisdiction, may be removed by a defendant . . . to [a] federal district court." 28 U.S.C. § 1441(a). "A defendant may remove an action to federal court based on federal question jurisdiction or diversity jurisdiction." Hunter v. Philip Morris USA, 582 F.3d 1039, 1042 (9th Cir. 2009) (citing 28 U.S.C. § 1441). It is presumed, however, "that a cause lies outside [the] limited jurisdiction [of the federal courts] and the burden of establishing the contrary rests upon the party asserting jurisdiction." Id. (internal quotation marks omitted); see also Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir.1992) (the Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction"). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." Gaus at 566. Where a case is removed from state court, the removing defendant bears the burden of establishing federal jurisdiction, including the amount in controversy requirement. Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 682-3 (9th Cir. 2006). The court "resolves all ambiguity in favor of remand." Hunter, 582 F.3d at 1042. If the district court determines that it lacks jurisdiction, the action should be remanded back to the state court. Martin v. Franklin Capital Corp., 546 U.S. 132, 134 (2005).

### III. ANALYSIS

BANA argues that there are five separate bases for federal jurisdiction in this case: (1) that Garrett's PAGA claim "arises under" a federal statute, conferring federal-question jurisdiction; (2) that BANA is an "officer (or . . . [a] person acting under that officer) of the United States," pursuant to 28 U.S.C. § 1442(a)(1); (3) that the requirements for diversity jurisdiction are satisfied; (4) that Garrett's claim qualifies as a "mass action" under the Class Action Fairness Act ("CAFA"); and (5) that Garrett's claim qualifies as a "class action" under CAFA. The Court

1    addresses each of these arguments in turn.

### A.   Federal-Question Jurisdiction

On its face, Plaintiff's complaint brings only a state-law action. However, BANA argues that, under the "artful pleading doctrine," this Court may assume jurisdiction when the state law claim substantially requires the resolution of a federal question. Opposition ("Opp'n") at 3, ECF No. 19. BANA argues that "this case 'arises under' federal law because Plaintiff's state law claim 'necessarily raises a disputed federal issue that is central to the case,' to wit, whether the National Bank Act of 1864, 12 U.S.C. §12, *et seq.* (the "NBA"), preempts Plaintiff's state law claim." Id.

"[S]ince 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. California, 463 U.S. 1, 14 (1983); see also Hunter, 582 F.3d 1042-43 (citing Franchise Tax Bd. and collecting other cases).

"Courts should invoke the doctrine [of artful pleading] only in limited circumstances as it raises difficult issues of state and federal relationships and often yields unsatisfactory results." Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033, 1041 (9th Cir. 2003) (internal quotation marks omitted). "A careful reading of artful pleading cases shows that no specific recipe exists for a court to alchemize a state claim into a federal claim—a court must look at a complex group of factors in any particular case to decide whether a state claim actually 'arises' under federal law." Id. at 1042-43. However, "Courts have fashioned a number of proxies to determine whether a state claim depends on the resolution of a federal question to such an extent as to trigger subject matter jurisdiction." Id. at 1045. "Is the federal question 'basic' and 'necessary' as opposed to 'collateral' and 'merely possible'?" Id. (citations omitted). Is the federal question 'pivotal' as opposed to merely 'incidental'?" Id. And finally, "[i]s the federal question 'direct and essential' as opposed to 'attenuated'?" Id.

BANA provides little authority in its papers to support its contention that these factors weigh in its favor. In fact, in the case that BANA primarily cites in its papers, the Ninth Circuit

1    found that the "[plaintiff] d[id] not have to rely on a violation of [federal law] to bring [his] claim
2    in California state court" and thus there was *no* basis for removal. Lippitt, 340 F.3d at 1043.
3    Similarly here, in order to bring a claim for violation of California Wage Order 4-2001, Garrett
4    must (1) show that the employer violated the state code (4-2001), (2) meeting state-law procedural
5    requirements, and (3) be an "aggrieved employee" as defined in Section 2699.3 of PAGA, a state
6    law. Cal. Labor Code § 2698 *et. seq.* Garrett must also show that she was not provided with a
7    suitable seat, that the nature of the work reasonably permitted use of seats, no suitable seats were
8    placed in reasonable proximity to the work area, and such seating would not have interfered with
9    the performance of her duties. 8 Cal. Code Reg. § 11070(14). As in Lippitt, none of these
10   requirements compels the Court to resolve a federal question. The federal question only arises as
11   a *defense*, not under the *claim* that Garrett asserts. Thus, the elements of her claim by themselves
12   do not constitute a basis for removal.

13   BANA's citation to Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg., 545 U.S.
14   308 (2005), Opp'n at 3, also provides little support for BANA's position. In Grable, a plaintiff
15   brought a quiet title action in state court, claiming that Defendant's title was invalid because 26
16   U.S.C. § 6335 required the IRS to give Grable notice of the sale by personal service, not by
17   certified mail. Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005).
18   The Supreme Court concluded that such a case was removable because the plaintiff was asking the
19   court to interpret 26 U.S.C. § 6335, a federal tax provision, in order to prove the state claim. Id. at
20   316. In the present matter, however, Garrett is not asserting a *claim* that requires the interpretation
21   of any federal law. BANA's *defense* may require such an interpretation, but that alone is not a
22   basis for removal.

23   With all of this said, the Court is aware that there is at least one exception to the otherwise
24   strong presumption that a federal defense does not confer federal-question jurisdiction over a
25   putative state-law claim: "a state claim may be removed to federal court . . . when a federal statute
26   *wholly displaces* the state-law cause of action through *complete pre-emption*." Beneficial Nat.
27   Bank v. Anderson, 539 U.S. 1, 8 (2003) (emphases added). The standard for determining whether
28   there is "complete pre-emption" requiring removal is when "the federal statute[] at issue

4

provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." Id.  In Beneficial Nat. Bank, the Supreme Court analyzed the specific provisions of the NBA governing usury and found that they provided such specific and exclusive procedures for determining and remedying usury that there is, in effect, "no such thing as a state-law claim of usury against a national bank." 539 U.S. at 11.  Hence, removal was proper.  BANA does not even cite Beneficial Nat. Bank, much less meet its burden of establishing that this action falls within its ambit.

Citing Watters v. Wachovia Bank, N.A., BANA argues that the Supreme Court "ha[s] 'interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." 550 U.S. 1, 12 (2007) (quoting Barnett Bank of Marion Cty., N.A. v. Nelson, 517 U.S. 25, 32 (1996)).  But the very next sentence of Watters makes clear that even this broad preemption is subject to exceptions that depend upon the particular nature of the state law and the NBA provision at issue: "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." 550 U.S. at 12.

BANA has not demonstrated that the NBA so directly controls the precise question of worker seating as to provide the exclusive cause of action through which such an action can be brought against a national bank.  To the contrary, "[t]he labor laws upon which plaintiff bases her claim are laws of general applicability, no different for a bank than for any business that wishes to conduct its affairs within California." Garibaldi v. Bank of America, No. 13-cv-02223 SI, ECF No. 44, at 6-7, 2014 WL 172284 at *4 (N.D. Cal. January 15, 2014).

In Garibaldi, the "[p]laintiff br[ought] ten causes of action: (1) breach of contract; (2) failure to pay accrued wages upon termination; (3) failure to pay overtime and/or straight-time pay; (4) missed meal breaks; (5) reimbursement of travel expenses; (6) waiting time penalties; (7) failure to provide accurate wage statements; (8) illegal form of payment and unlawful coercion; (9) unfair business practices; and (10) a claim under [PAGA]." Id. at 2-3.  The Garibaldi court determined that "[r]equiring a national bank to comply with state labor laws regarding the

compensation of employees does not conflict with the business of banking in a manner that would require the Court to find these laws preempted by the NBA." Id. at 7. The Garibaldi court held that those regulations were not preempted by the NBA *at all*. For similar reasons, this Court finds that BANA has not met its much higher burden of demonstrating that this action is so "completely preempted" as to prohibit remand.

### B.   Federal Officer Removal

A state action is removable when it is directed against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . ." 28 U.S.C. § 1442(a)(1). Pursuant to this statute, "Federal officers, and their agents, may remove cases based on acts performed under color of their federal office if they assert a colorable federal defense." Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006). In order to establish jurisdiction under § 1442, a defendant must demonstrate that "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Id. BANA argues that it can be considered a "federal officer or agent" because it acts under the supervision of the federal Office of the Comptroller of Currency (the "OCC"). See 12 U.S.C. § 93a.

BANA cites no case in which a national bank was considered a "federal officer" or an "agent" under § 1442(a)(1). In the cases cited in Durham, the removing defendants were postal service workers (Mesa v. California, 489 U.S. 121, 129 (1989)) and federal judges (Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 427 (1999)), both of which have far more natural claims to being federal officers than a bank does. In the only cases BANA cites in which removal was proper, the defendants were federal prison wardens and medical officers (Willingham v. Morgan, 395 U.S. 402, 409 (1969)), a government contractor acting under direct control of the U.S. Navy (Mack v. AC & S, Inc., 838 F. Supp. 1099, 1103 (D. Md. 1993)), and the Federal Finance Bank, a corporate body Congress itself created and specifically designated to be "an instrumentality of the United States Government" (Kinetic Sys., Inc. v. Fed. Fin. Bank, 895 F. Supp. 2d 983, 987-88 (N.D. Cal. 2012)).

1    Even assuming that a national bank is potentially eligible for federal-officer removal, the

2 burden is on BANA to show that its action in denying seating was "taken pursuant to a federal

3 official's directions." Durham, 445 F.3d at 1251.  In its Opposition BANA merely states that

4 "'[d]irect and detailed control[] is established by showing strong government involvement and the

5 possibility that a defendant could be sued in a state court as a result of the federal control," as well

6 as that BANK is subject to "'direct and detailed control' by the . . . [OCC]." Opp'n. at 6 (citations

7 omitted).  But BANA never provides evidence that the OCC gave BANA the orders that led to the

8 present claim, *i.e.*, directions for employees to remain standing.   As for the fact that BANA acts

9 generally under regulatory supervision by the OCC, a unanimous Supreme Court has held:

> [A] highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 153 (2007).  In rejecting Phillip Morris'

claim to federal officer removal, the Court continued:

> [D]ifferences in the degree of regulatory detail or supervision cannot by themselves transform Philip Morris' regulatory compliance into the kind of assistance that might bring the FTC within the scope of the statutory phrase "acting under " a federal "officer." *Supra*, at 2307. And, though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship. This relationship, as we have explained, cannot be construed as bringing Philip Morris within the terms of the statute.

Id. at 157.  While national banks may have a stronger claim to being an "instrumentality" of the

federal government than Phillip Morris did, the general principle remains that pervasive regulation

does not bring an entity within the reach of § 1442(a)(1).

The only case this Court has identified analyzing national banks and federal-officer

removal, the District Court of South Dakota held that a defendant national bank was not acting

"under the color of office" of the OCC, nor was it a "person" acting under the OCC. First Nat.

Bank v. Aberdeen Nat. Bank, 471 F. Supp. 460, 466 (D.C. S.D. 1979), vacated on other grounds.

7

In that case, a national bank disputed the legitimacy of another bank's claim to use the word "First" in its name, a name change that had been specifically approved by the Comptroller of the Currency.  Id.  The court held that although the Comptroller had approved the name change, approval of the action should not be confused with the act itself, emphasizing that virtually all business conducted by a national bank is pursuant to either the authority or approval of the Comptroller or his agent.  Id. at 267.  The court noted that "to extend the removal statute" as the removing defendant had proposed "would not only open the doors of the federal court to almost any action based upon the activity of a national bank, but would, most likely, make the Comptroller a necessary party."  Id.  In this action, in which the OCC's relationship to the challenged action is much more attenuated, this rationale applies even more strongly.

While the federal officer statute is to be "construed broadly," even a broad construction does not bring BANA within its ambit, at least to the actions challenged in the complaint.

### C. Diversity of Citizenship

BANA argues that removal is proper pursuant to 28 U.S.C. § 1332(a), through which this Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a).  Plaintiff does not dispute that her state citizenship is diverse from BANA's, but she does dispute that the amount in controversy requirement is satisfied.

"In [the Ninth C]ircuit, where the amount of damages are not specified in the complaint, it is the removing party's burden to show by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount." Lewis v. Verizon Communications, Inc., 627 F.3d 395, 397 (9th Cir. 2010).  The amount in controversy includes the amount of damages in dispute, as well as attorney's fees, if authorized by statute or contract.  Galt G/S v. JSS Scandinavia, 142 F.3d 1150, 1155–56 (9th Cir. 1998).  Subsection (g) of PAGA states that "[a]ny employee who prevails in any action shall be entitled to an award of reasonable attorney's fees and costs." Cal. Lab. Code § 2699(g).

As the Ninth Circuit has recently summarized PAGA:

> With passage of the Private Attorneys General Act of 2004 ("PAGA"), the California Legislature fundamentally altered the state's approach to collecting civil penalties for labor code violations. Though the Labor and Workforce Development Agency ("LWDA") retained primacy over private enforcement efforts, under PAGA, if the LWDA declines to investigate or issue a citation for an alleged labor code violation, an aggrieved employee may commence a civil action "on behalf of himself or herself and other current or former employees" against his or her employer. Cal. Lab.Code § 2699(a); Arias v. Super. Ct., 46 Cal.4th 969, 95 Cal.Rptr.3d 588, 209 P.3d 923, 930 (2009). If the representative plaintiff prevails, the aggrieved employees are statutorily entitled to 25% of the civil penalties recovered while the LWDA is entitled to 75%. Cal. Lab.Code § 2699(i).

Urbino v. Orkin Servs. of California, Inc., 726 F.3d 1118, 1121 (9th Cir. 2013). Prior to Urbino, Ninth Circuit district courts differed on whether courts should aggregate PAGA penalties to calculate the amount in controversy under the diversity statute. See, e.g., Thomas v. Aetna Health of California, Inc., No. 1:10-CV-01906-AWI, 2011 WL 2173715, *19 (E.D. Cal. June 2, 2011) ("the amount at stake in a PAGA claim is predicated on the total amount of the penalties that can be sought by the aggrieved employees as the proxy of the LWDA") Zator v. Sprint/United Mgmt. Co., No. 09-cv-2577-LAB MDD, 2011 WL 1168319, at *1 (S.D. Cal. Mar. 29, 2011) ("The claim by one plaintiff must satisfy the $75,000 amount in controversy requirement; the claims of other aggrieved employees cannot be aggregated to reach that threshold").

But in Urbino, the Ninth Circuit held that "the potential penalties" under PAGA are not "combined or aggregated" in calculating 28 U.S.C. § 1332(a)'s "amount in controvery" requirement. Id. at 1121; see also id. at 1122 ("[a]ggrieved employees have a host of claims available to them . . . [but] diversity jurisdiction does not lie because their claims cannot be aggregated"). The Urbino court reached this conclusion for two separate reasons. First, it held that a single plaintiff holds his rights "individually," not only as part of a group, and that "each employee suffers a unique injury." Id. Secondly, the court held that, even insofar as Urbino could be said to be bringing his claims on behalf of other workers, "[t]o the extent Plaintiff can—and does—assert anything but his individual interest, however, we are unpersuaded that such a suit, the primary benefit of which will inure to the state, satisfies the requirements of federal diversity jurisdiction." Id. at 1122-23. "The state, as the real party in interest, is not a 'citizen' for diversity

9

purposes." Id. at 1123 (citing Nav. Sav. Ass'n v. Lee, 446 U.S. 458, 461 (1980)).

BANA argues, however, that Garrett's claim alone meets the $75,000 requirement, and in the alternative, that the potential attorney's fees in this action exceed the $75,000 requirement. The Court addresses each argument in turn.

### 1. Garrett's Individual Recovery

"PAGA penalties are $100 for each initial violation and $200 for each subsequent violation." Allen v. Utiliquest, LLC, No. 13-cv-00049 SBA, 2013 WL 4033673, *7 (N.D. Cal. Aug. 1, 2013) (citations omitted). BANA does not dispute that the number of violations allegedly endured by Garrett herself cannot add up to more than $75,000 in statutory penalties. This would seem to be fatal to diversity jurisdiction after Urbino. However, BANA argues that this action is distinct from Urbino because:

> the Bank has not asserted the aggregation of civil penalties that other allegedly aggrieved employees might recover as the basis for establishing the amount in controversy. Rather, the Bank removed this action on the basis only of the amount of civil penalties that *Plaintiff individually* stands to recover. The amount in controversy for Plaintiff individually is well over $75,000 because Plaintiff might be entitled to recover for herself 25% of the total amount of civil penalties at issue, which would amount to approximately *$5,616,000*.

Opp'n at 7-8 (emphases in the original). BANA argues that PAGA is ambiguous as to the identity of the "aggrieved employees" who recover 25% of the total penalties. Opp'n. at 8. BANA contends that PAGA could be interpreted to consider *Garrett herself*, the representative plaintiff, to be the only "aggrieved employee," and that because she brought this action she herself might receive 25% of the total penalties. Id. at 9. As BANA reads Urbino, the Ninth Circuit decided only that the claims of *different* "aggrieved employees" are not aggregated, and did not consider the possibility that the representative plaintiff herself could be the only "aggrieved employee."

BANA's interpretation of both Urbino and PAGA are far-fetched. Its view of Urbino makes little sense, since John Urbino was the sole representative plaintiff in that case, just as Garrett is the sole representative here. 726 F.3d at 1121. Thus, BANA's argument applied to Urbino's claims would have rendered diversity jurisdiction proper – which is the not the result the

10

Ninth Circuit reached.[1]  It simply is not possible to apply BANA's construction of Urbino to that same case, much less this one.

More fundamentally, BANA's argument rests on a mistaken interpretation of PAGA. Garrett cannot receive 25% of all statutory penalties for herself personally.  PAGA creates the "potential for *nonparty aggrieved employees* to benefit from a favorable judgment under the act." Arias v. Superior Court, 46 Cal. 4th 969, 987 (2009) (emphasis added).  This is incompatible with BANA's argument that the representative party in an action is the only "aggrieved employee."  In describing PAGA, Urbino stated that "[i]f the representative plaintiff prevails, the aggrieved employees are statutorily entitled to 25% of the civil penalties recovered," drawing a clear distinction between plaintiff on one hand, and the employees as a group on the other.  726 F.3d at 1121.[2]

This authority is consistent with the Court's own statutory interpretation of PAGA.  PAGA states that "civil penalties recovered by aggrieved *employees* shall be distributed as follows: 75 percent to the Labor and Workforce Development Agency ["LWDA"]. . . ; and 25 percent to the aggrieved *employees*."  Cal. Lab. Code § 2699 (emphases added).  PAGA further defines "aggrieved employees" as "*any person* who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  Cal. Lab. Code § 2699 (emphasis added).  This language indicates that all persons against whom a violation was committed, rather than only the representative plaintiff who brings the action, recover a share of 25 percent of the total penalties.

BANA attempts to create ambiguity where there is none by stating that subsection (g)(1) of PAGA states "an aggrieved employee may recover the civil penalty described in subdivision (f)." Opp'n. at 8.  This language does not contradict the subsections quoted above.  Subsection (f) states the monetary amount of each penalty per violation that a defendant would have to pay.  Cal. Lab.

---

[1] The total penalties at issue in Urbino for initial violations alone were $405,500, and so a 25% award would have brought Plaintiff Urbino over the amount-in-controversy threshold.  726 F.3d at 1121.

[2] On BANA's reading, the Ninth Circuit would simply have written "if the representative plaintiff prevails, he or she is statutorily entitled to 25% of the civil penalties recovered."

Code § 2699(f). Thus, it is fairer to say that (g)(1) indicates how to calculate the civil penalty each employee is allowed to recover, not the amount the employee bringing the suit is allowed to recover. If the latter were the case, the statute would at least state that the plaintiff bringing the suit "may recover the civil *penalties* described in subdivision (f)." This is not the case. Subsection (g)(1) further combines these penalties to state that 75% of this whole amount of recovery goes to the LWDA and 25% of the total recovery amount for all aggrieved employees goes to the aggrieved employees; presumably the same employees that the amount of penalties were calculated from. For these reasons, BANA's argument fails.

### 2. Attorney's Fees

BANA argues that even if Garrett's recovery amount does not meet the amount in controversy, the attorney's fees would meet the $75,000 requirement. Opp'n. at 10.

> This court has affirmed the use of two separate methods for determining attorney's fees, depending on the case. In 'common-fund' cases where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method. The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). The Ninth Circuit has established that 25% is the benchmark award for attorney's fees in a common fund case. Id. However, "[i]n employment, civil rights and other injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof." Id. "The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate. . . . The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." Hanlon, 150 F.3d at 1029 (citations omitted).

For BANA to succeed under either distribution of attorney's fees, it must show by a preponderance of the evidence that attorney's fees can be aggregated to reach the amount in controversy requirement.

### a. 25% Benchmark Calculation

12

BANA argues that the attorney's fees in this action would presumptively be calculated as 25% of the total recovery, and therefore if the action succeeds on all of its claims, the amount of attorney's fees is likely to be more than $5 million. Opp'n. at 11. Urbino did not directly address the possibility that PAGA attorney's fees could meet the "amount in controversy" requirement, so the Court turns to Ninth Circuit authority regarding class action attorney's fees for guidance.

Gibson v. Chrysler Corp. was a pre-CAFA class action under a state statute that allowed for attorney's fees. 261 F.3d 927, 942 (9th Cir. 2001), holding modified post-CAFA by Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005). Defendant Chrysler argued that the entirety of potential attorney's fees available under the California statute should be added to the named plaintiffs' claims, bringing each named plaintiff over the amount-in-controversy requirement. The Gibson court rejected this argument. Gibson analyzed the California statute at issue and noted that it allowed attorney's fees "to a successful party," as distinguished from an award allowed under another statute that was allowed to "the *representative* parties." "California courts have stated that § 1021.5 awards are a 'bounty' for plaintiffs who successfully litigate in the public interest[], but they have not held that this 'bounty' goes only to named plaintiffs in a class action." Gibson, 261 F.3d at 942. "We therefore hold that, under this California law at least, attorneys' fees are not awarded solely to the named plaintiffs in a class action, and that they therefore cannot be allocated solely to those plaintiffs for purposes of amount in controversy." Id. at 942-43 (citations omitted).

Similarly here, PAGA attorney's fees are allowed to "[a]ny *employee* who prevails in any action," not to the specific representative parties who bring the action. Cal. Lab. Code § 2699(g)(1) (emphasis added). For this reason, the Court concludes that the total possible attorney's fees in this action are not allocated towards Plaintiff Garrett's claims for purposes of considering the "amount in controversy" requirement. At the very least, BANA has failed to meet its burden to demonstrate otherwise.

Prior to Gibson, the Ninth Circuit held that defendants could not allocate attorney's fees so as to evade an otherwise applicable deficit in the amount in controversy. Goldberg v. CPC Int'l, Inc., 678 F.2d 1365, 1367 (1982). At that time, before CAFA, the law under Zahn v. Int'l Paper

13

Co. was that the "'matter in controversy' requirement" had to "be satisfied by each member of the plaintiff class" in any class action. 414 U.S. 291, 292 (1973). The Goldberg court reasoned that if class members' claims could not be aggregated to meet the amount in controversy requirement, attributing attorney's fees to the named plaintiff only would defeat the purpose of disallowing claim aggregation in the first place. 678 F.2d at 1367.

Since CAFA altered the premise of Goldberg, its specific conclusion is no longer sound but its logic remains valid. When the rule is that claims are not aggregated (as the rule was then for class actions under Zahn and as it is now for PAGA actions under Urbino), it "would seriously undermine" the rule to allow attorney's fees to be allocated solely to a named plaintiff in determining the amount in controversy. Id.

### b.    Lodestar

It seems much more likely that any attorney's fees would be allocated on a "common fund" basis rather than lodestar. In any case, for the same reasons discussed immediately *supra*, even if a court used lodestar to determine the amount of attorney's fees, for "amount in controversy" purposes, the amount of fees would be applied only to the named plaintiff's claims in proportion to her share of the total recovery. Under these circumstances, Garrett's attorney would have to bill $374.4 million, and be awarded that amount by a court as a "reasonable" attorney's fee award, to meet the amount in controversy requirement.[3]

"[I]n cases where a plaintiff's state court complaint does not specify a particular amount of damages, the removing defendant bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds [the statutory amount]." Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996).[4]  "Under this burden, the defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds that amount.'" Id.

Not every action that permits attorney's fees can be removed from in federal court on the

---

[3] Total number of tellers (4,992) multiplied by the minimum $75,000 requirement. Defendant's Notice of Removal at 12, ECF No. 1.

[4] $50,000 was the amount in controversy requirement at the time of the Sanchez decision.

speculative possibility that an attorney could be awarded over $75,000 per claim. That possibility seems particularly speculative here. Especially given the statutory presumption against removal, the Court finds that BANA has failed to meet its burden of showing that is more likely than not that the amount in controversy applicable to Plaintiff Garrett's claim exceeds $75,000.

### D.  Mass Action under CAFA

BANA argued in its papers that this PAGA action qualifies as "mass action" under CAFA. A mass action is "any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact . . .." 28 U.S.C. § 1332(d)(11)(B)(i). "[M]ass actions filed in state court that satisfy CAFA's requirements may be removed to federal court, 28 U.S.C. § 1453, but federal jurisdiction in a mass action, unlike a class action, 'shall exist only over those plaintiffs' whose claims individually satisfy the $75,000 amount in controversy requirement, § 1332(d)(11)(B)(i)." Mississippi ex rel. Hood v. AU Optronics Corp., ___ U.S. ___, 134 S. Ct. 736, 740 (2014) ("Hood").

In Hood, a unanimous United States Supreme Court recently determined that a public attorney general action did not qualify as a "mass action" under CAFA. Hood held that "because the State of Mississippi is the only named plaintiff in the instant action, the case must be remanded to state court." Id. at 740. Here, Garrett, the only named plaintiff, is bringing her claims in a representative capacity on behalf of others who stand to benefit, just as the State of Mississippi was in Hood. California permits such actions to proceed as private attorney general actions rather than be brought only by governmental officers, but there is no reason to think this distinction makes any difference in the analysis. Moreover, even to the extent the Court considered Garrett's representative capacity, "the primary benefit of" a PAGA suit "inure[s] to the state," rather than to numerous specific employees. Urbino, 726 F.3d at 1122-23; see also Arias, 46 Cal. 4th 969, 986 (2009) ("[a]n employee plaintiff suing, as here, under the Labor Code Private Attorneys General Act of 2004, does so as the proxy or agent of the state's labor law enforcement agencies").

At oral argument, BANA's counsel conceded that this basis for jurisdiction is no longer viable after Hood. Since this action does not meet the "100 persons or more" requirement, it is not

1 removable as a CAFA "mass action." In addition, each "plaintiff" does not meet the $75,000
2 requirement to remove a mass action to federal court, for the same reasons discussed in the
3 diversity jurisdiction analysis *supra*.

### E. Class Action under CAFA

Finally, BANA argues that the suit qualifies as a removable "class action" under CAFA.

Class actions filed in state court that satisfy CAFA's requirements may be removed to federal court, 28 U.S.C. § 1453, as long as the aggregate amount in controversy exceeds the $5 million requirement. Hood, 134 S. Ct. 736, 740. "[T]he term 'class action' means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action[.]" 28 U.S.C. § 1332(d)(1)(B). Plaintiff did not file her suit as a class action, but BANA argues that a PAGA suit is "similar" enough to a Rule 23 action to be considered a "class action" under CAFA. Opp'n. at 11.

After oral argument on the instant motion, the Ninth Circuit forcelosed this possibility in Baumann v. Chase Investment Services Corp., ___ F.3d ___, Case No. 12-5564, 2014 WL 983587 (9th Cir. Mar. 13, 2014). PAGA actions are not CAFA "class actions," and are not removable on that ground.[5]

### IV. CONCLUSION

For the foregoing reasons, this Court concludes that BANA has failed to demonstrate that this Court has subject-matter jurisdiction over this action. Since this Court cannot exercise

/ / /

/ / /

/ / /

---

[5] The Court might ordinarily give the parties leave to file supplemental briefing to address later-decided authority, but will not do so here for two reasons. First, it is impossible to imagine that Defendant could make any argument to salvage this ground for removal after Baumann. Second, even before Baumann issued, this Court was persuaded by the rationale of other district courts that PAGA actions were not CAFA "class actions." See, e.g., Sample v. Big Lots Stores, Inc., No. 10-cv-03276 SBA, 2010 WL 4939992, at *3 (N.D. Cal. Nov. 30, 2010).

subject- matter jurisdiction, it takes no action on BANA's Motion to Dismiss. This case is REMANDED to the Alameda Superior Court for further proceedings.

**IT IS SO ORDERED.**

Dated: April 24, 2014

_____
JON S. TIGAR
United States District Judge