UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICOLE GARRETT,

          Plaintiff,

    v.

BANK OF AMERICA , N.A., et al.,

          Defendants.

Case No.  13-cv-05263-JST

**ORDER GRANTING MOTION TO REMAND**

ECF No. 16

## I.      INTRODUCTION

Plaintiff brings this Motion to Remand her complaint to Alameda Superior Court, arguing that Defendant Bank of America ("BANA") has failed to demonstrate that this Court has subject-matter jurisdiction over her putatively state-law cause of action.  BANA opposes this motion and has also filed a separate Motion to Dismiss.  The matter came for hearing on March 7, 2014.

## II.      BACKGROUND

### A.      Factual & Procedural History

On October 11, 2013, Plaintiff Nicole Garrett ("Garrett"), a former bank teller employed by BANA, filed suit against Defendant Bank of America ("BANA") in Alameda Superior Court alleging that BANA has violated California's labor law provisions that require employers to provide seats for their workers.  8 Cal. Code Reg. § 11070(14); Plaintiff's Memorandum of Points and Authorities ("MPA") at 1-2, ECF No. 16-1.  Garrett's complaint brings a single "representative" cause of action under California's Private Attorney General Act ("PAGA"), Cal. Labor Code § 2698 *et. seq.*  MPA at 1-2.  On November 13, 2013, BANA removed the complaint to this Court.  Id. at 2.  On November 22, 2013, Garrett filed a Motion to Remand the case back to Alameda Superior Court.  Plaintiff's Motion to Remand ("Mot."), ECF. No. 16.  On the same date,

1    BANA filed a Motion to Dismiss based on the First-to-File Rule.  Defendant's Motion to Dismiss

2    ("Mot. Dismiss"), ECF No. 15.

3         Since the Motion to Remand presents "a threshold jurisdictional question," the Court must

4    "decide it first," before addressing the Motion to Dismiss.  Lowry v. Barnhart, 329 F.3d 1019,

5    1022 (9th Cir. 2003) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

6         **B.    Legal Standard**

7         "[A]ny civil action brought in a[s]tate court of which the district courts of the United

8    States have original jurisdiction, may be removed by a defendant . . . to [a] federal district court."

9    28 U.S.C. § 1441(a).  "A defendant may remove an action to federal court based on federal

10   question jurisdiction or diversity jurisdiction."  Hunter v. Philip Morris USA, 582 F.3d 1039, 1042

11   (9th Cir. 2009) (citing 28 U.S.C. § 1441).  It is presumed, however, "that a cause lies outside [the]

12   limited jurisdiction [of the federal courts] and the burden of establishing the contrary rests upon

13   the party asserting jurisdiction."  Id. (internal quotation marks omitted); see also Gaus v. Miles,

14   Inc., 980 F.2d 564, 566 (9th Cir.1992) (the Ninth Circuit "strictly construe[s] the removal statute

15   against removal jurisdiction").  "Federal jurisdiction must be rejected if there is any doubt as to the

16   right of removal in the first instance."  Gaus at 566.  Where a case is removed from state court, the

17   removing defendant bears the burden of establishing federal jurisdiction, including the amount in

18   controversy requirement.  Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 682-3 (9th Cir.

19   2006).  The court "resolves all ambiguity in favor of remand."  Hunter, 582 F.3d at 1042.  If the

20   district court determines that it lacks jurisdiction, the action should be remanded back to the state

21   court.  Martin v. Franklin Capital Corp., 546 U.S. 132, 134 (2005).

22   **III.    ANALYSIS**

23        BANA argues that there are five separate bases for federal jurisdiction in this case:  (1) that

24   Garrett's PAGA claim "arises under" a federal statute, conferring federal-question jurisdiction;

25   (2) that BANA is an "officer (or . . . [a] person acting under that officer) of the United States,"

26   pursuant to 28 U.S.C. § 1442(a)(1); (3) that the requirements for diversity jurisdiction are

27   satisfied; (4) that Garrett's claim qualifies as a "mass action" under the Class Action Fairness Act

28   ("CAFA"); and (5) that Garrett's claim qualifies as a "class action" under CAFA.  The Court

United States District Court
Northern District of California

2

1    addresses each of these arguments in turn.

2         A.    **Federal-Question Jurisdiction**

3         On its face, Plaintiff's complaint brings only a state-law action.  However, BANA argues

4    that, under the "artful pleading doctrine," this Court may assume jurisdiction when the state law

5    claim substantially requires the resolution of a federal question.  Opposition ("Opp'n") at 3, ECF

6    No. 19.  BANA argues that "this case 'arises under' federal law because Plaintiff's state law claim

7    'necessarily raises a disputed federal issue that is central to the case,' to wit, whether the National

8    Bank Act of 1864, 12 U.S.C. §12, *et seq.* (the "NBA"), preempts Plaintiff's state law claim."  Id.

9         "[S]ince 1887 it has been settled law that a case may not be removed to federal court on the

10   basis of a federal defense, including the defense of preemption, even if the defense is anticipated

11   in the plaintiff's complaint, and even if both parties admit that the defense is the only question

12   truly at issue in the case."  Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust

13   for S. California, 463 U.S. 1, 14 (1983); see also Hunter, 582 F.3d 1042-43 (citing Franchise Tax

14   Bd. and collecting other cases).

15        "Courts should invoke the doctrine [of artful pleading] only in limited circumstances as it

16   raises difficult issues of state and federal relationships and often yields unsatisfactory results."

17   Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033, 1041 (9th Cir. 2003) (internal

18   quotation marks omitted).  "A careful reading of artful pleading cases shows that no specific

19   recipe exists for a court to alchemize a state claim into a federal claim—a court must look at a

20   complex group of factors in any particular case to decide whether a state claim actually 'arises'

21   under federal law."  Id. at 1042-43.  However, "Courts have fashioned a number of proxies to

22   determine whether a state claim depends on the resolution of a federal question to such an extent

23   as to trigger subject matter jurisdiction."  Id. at 1045.  "Is the federal question 'basic' and

24   'necessary' as opposed to 'collateral' and 'merely possible'?"  Id. (citations omitted).  Is the

25   federal question 'pivotal' as opposed to merely 'incidental'?"  Id.  And finally, "[i]s the federal

26   question 'direct and essential' as opposed to 'attenuated'?"  Id.

27        BANA provides little authority in its papers to support its contention that these factors

28   weigh in its favor.  In fact, in the case that BANA primarily cites in its papers, the Ninth Circuit

United States District Court
Northern District of California

3

United States District Court
Northern District of California

found that the "[plaintiff] d[id] not have to rely on a violation of [federal law] to bring [his] claim in California state court" and thus there was *no* basis for removal.  Lippitt, 340 F.3d at 1043.  Similarly here, in order to bring a claim for violation of California Wage Order 4-2001, Garrett must (1) show that the employer violated the state code (4-2001), (2) meet state-law procedural requirements, and (3) be an "aggrieved employee" as defined in Section 2699.3 of PAGA, a state law.  Cal. Labor Code § 2698 *et. seq.*  Garrett must also show that she was not provided with a suitable seat, that the nature of the work reasonably permitted use of seats, that no suitable seats were placed in reasonable proximity to the work area, and that such seating would not have interfered with the performance of her duties.  8 Cal. Code Reg. § 11070(14).  As in Lippitt, none of these requirements compel the Court to resolve a federal question.  The federal question only arises as a *defense*, not under the *claim* that Garrett asserts.  Thus, the elements of her claim by themselves do not constitute a basis for removal.

BANA's citation to Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005), Opp'n at 3, also provides little support for BANA's position.  In Grable, a plaintiff brought a quiet title action in state court, claiming that Defendant's title was invalid because 26 U.S.C. § 6335 required the IRS to give Grable notice of the sale by personal service, not by certified mail.  Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005).  The Supreme Court concluded that such a case was removable because the plaintiff was asking the court to interpret 26 U.S.C. § 6335, a federal tax provision, in order to prove the state claim.  Id. at 316.  In the present matter, however, Garrett is not asserting a *claim* that requires the interpretation of any federal law.  BANA's *defense* may require such an interpretation, but that alone is not a basis for removal.

With all of this said, the Court is aware that there is at least one exception to the otherwise strong presumption that a federal defense does not confer federal-question jurisdiction over a putative state-law claim: "a state claim may be removed to federal court . . . when a federal statute *wholly displaces* the state-law cause of action through *complete pre-emption*."  Beneficial Nat. Bank v. Anderson, 539 U.S. 1, 8 (2003) (emphases added).  The standard for determining whether there is "complete pre-emption" requiring removal is when "the federal statute[] at issue

4

provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." Id.  In Beneficial Nat. Bank, the Supreme Court analyzed the specific provisions of the NBA governing usury and found that they provided such specific and exclusive procedures for determining and remedying usury that there is, in effect, "no such thing as a state-law claim of usury against a national bank." 539 U.S. at 11.  Hence, removal was proper.  BANA does not even cite Beneficial Nat. Bank, much less meet its burden of establishing that this action falls within its ambit.

Citing Watters v. Wachovia Bank, N.A., BANA argues that the Supreme Court "ha[s] 'interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." 550 U.S. 1, 12 (2007) (quoting Barnett Bank of Marion Cty., N.A. v. Nelson, 517 U.S. 25, 32 (1996)).  But the very next sentence of Watters makes clear that even this broad preemption is subject to exceptions that depend upon the particular nature of the state law and the NBA provision at issue: "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers."  550 U.S. at 12.

BANA has not demonstrated that the NBA so directly controls the precise question of worker seating as to provide the exclusive cause of action through which such an action can be brought against a national bank.  To the contrary, "[t]he labor laws upon which plaintiff bases her claim are laws of general applicability, no different for a bank than for any business that wishes to conduct its affairs within California."  Garibaldi v. Bank of America, No. 13-cv-02223 SI, 2014 WL 172284, at *4 (N.D. Cal. January 15, 2014).

In Garibaldi, the "[p]laintiff br[ought] ten causes of action: (1) breach of contract; (2) failure to pay accrued wages upon termination; (3) failure to pay overtime and/or straight-time pay; (4) missed meal breaks; (5) reimbursement of travel expenses; (6) waiting time penalties; (7) failure to provide accurate wage statements; (8) illegal form of payment and unlawful coercion; (9) unfair business practices; and (10) a claim under [PAGA]." Id. at 2-3.  The Garibaldi court determined that "[r]equiring a national bank to comply with state labor laws regarding the

United States District Court
Northern District of California

5

compensation of employees does not conflict with the business of banking in a manner that would require the Court to find these laws preempted by the NBA." Id. at 7.  The Garibaldi court held that those regulations were not preempted by the NBA *at all*.  For similar reasons, this Court finds that BANA has not met its much higher burden of demonstrating that this action is so "completely preempted" as to prohibit remand.

### B.    Federal Officer Removal

A state action is removable when it is directed against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . ."  28 U.S.C. § 1442(a)(1).  Pursuant to this statute, "Federal officers, and their agents, may remove cases based on acts performed under color of their federal office if they assert a colorable federal defense."  Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006).  In order to establish jurisdiction under § 1442, a defendant must demonstrate that "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'"  Id.  BANA argues that it can be considered a "federal officer or agent" because it acts under the supervision of the federal Office of the Comptroller of Currency (the "OCC").  See 12 U.S.C. § 93a.

BANA cites no case in which a national bank was considered a "federal officer" or an "agent" under § 1442(a)(1).  In the cases cited in Durham, the removing defendants were postal service workers (Mesa v. California, 489 U.S. 121, 129 (1989)) and federal judges (Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 427 (1999)), both of which have far more natural claims to being federal officers than a bank does.  In the only cases BANA cites in which removal was proper, the defendants were federal prison wardens and medical officers (Willingham v. Morgan, 395 U.S. 402, 409 (1969)), a government contractor acting under direct control of the U.S. Navy (Mack v. AC & S, Inc., 838 F. Supp. 1099, 1103 (D. Md. 1993)), and the Federal Finance Bank, a corporate body Congress itself created and specifically designated to be "an instrumentality of the United States Government" (Kinetic Sys., Inc. v. Fed. Fin. Bank, 895 F. Supp. 2d 983, 987-88 (N.D. Cal. 2012)).

United States District Court
Northern District of California

1   Even assuming that a national bank is potentially eligible for federal-officer removal, the

2   burden is on BANA to show that its action in denying seating was "taken pursuant to a federal

3   official's directions." Durham, 445 F.3d at 1251.  In its Opposition, BANA merely states that

4   "'[d]irect and detailed control[] is established by showing strong government involvement and the

5   possibility that a defendant could be sued in a state court as a result of the federal control," as well

6   as that BANK is subject to "'direct and detailed control' by the . . . [OCC]." Opp'n. at 6 (citations

7   omitted).  But BANA never provides evidence that the OCC gave BANA the orders that led to the

8   present claim, *i.e.*, directions for employees to remain standing.   As for the fact that BANA acts

9   generally under regulatory supervision by the OCC, a unanimous Supreme Court has held:

> [A] highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

14  Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 153 (2007).  In rejecting Phillip Morris'

15  claim to federal officer removal, the Court continued:

> [D]ifferences in the degree of regulatory detail or supervision cannot by themselves transform Philip Morris' regulatory compliance into the kind of assistance that might bring the FTC within the scope of the statutory phrase "acting under " a federal "officer." *Supra*, at 2307. And, though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship. This relationship, as we have explained, cannot be construed as bringing Philip Morris within the terms of the statute.

22  Id. at 157.  While national banks may have a stronger claim to being an "instrumentality" of the

23  federal government than Phillip Morris did, the general principle remains that pervasive regulation

24  does not bring an entity within the reach of § 1442(a)(1).

25  In the only case this Court has identified analyzing national banks and federal-officer

26  removal, the District Court of South Dakota held that a defendant national bank was not acting

27  "under the color of office" of the OCC, nor was it a "person" acting under the OCC.  First Nat.

28  Bank v. Aberdeen Nat. Bank, 471 F. Supp. 460, 466 (D.C. S.D. 1979), vacated on other grounds.

7

1    In that case, a national bank disputed the legitimacy of another bank's claim to use the word

2    "First" in its name, a name change that had been specifically approved by the Comptroller of the

3    Currency.  Id.  The court held that although the Comptroller had approved the name change,

4    approval of the action should not be confused with the act itself, emphasizing that virtually all

5    business conducted by a national bank is pursuant to either the authority or approval of the

6    Comptroller or his agent.  Id. at 267.  The court noted that "to extend the removal statute" as the

7    removing defendant had proposed "would not only open the doors of the federal court to almost

8    any action based upon the activity of a national bank, but would, most likely, make the

9    Comptroller a necessary party."  Id.  In this action, in which the OCC's relationship to the

10   challenged action is much more attenuated, this rationale applies even more strongly.

11        While the federal officer statute is to be "construed broadly," even a broad construction

12   does not bring BANA within its ambit, at least as to the actions challenged in the complaint.

13        **C.        Diversity of Citizenship**

14        BANA argues that removal is proper pursuant to 28 U.S.C. § 1332(a), through which this

15   Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the

16   sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different

17   States."  28 U.S.C. § 1332(a).  Plaintiff does not dispute that her state citizenship is diverse from

18   BANA's, but she does dispute that the amount in controversy requirement is satisfied.

19        "In [the Ninth C]ircuit, where the amount of damages are not specified in the complaint, it

20   is the removing party's burden to show by a preponderance of the evidence that the amount in

21   controversy exceeds the jurisdictional amount."  Lewis v. Verizon Communications, Inc., 627

22   F.3d 395, 397 (9th Cir. 2010).  The amount in controversy includes the amount of damages in

23   dispute, as well as attorney's fees, if authorized by statute or contract.  Galt G/S v. JSS

24   Scandinavia, 142 F.3d 1150, 1155–56 (9th Cir. 1998).  Subsection (g) of PAGA states that "[a]ny

25   employee who prevails in any action shall be entitled to an award of reasonable attorney's fees and

26   costs."  Cal. Lab. Code § 2699(g).

27        As the Ninth Circuit has recently summarized PAGA:

28

United States District Court
Northern District of California

8

> With passage of the Private Attorneys General Act of 2004 ("PAGA"), the California Legislature fundamentally altered the state's approach to collecting civil penalties for labor code violations. Though the Labor and Workforce Development Agency ("LWDA") retained primacy over private enforcement efforts, under PAGA, if the LWDA declines to investigate or issue a citation for an alleged labor code violation, an aggrieved employee may commence a civil action "on behalf of himself or herself and other current or former employees" against his or her employer. Cal. Lab.Code § 2699(a); Arias v. Super. Ct., 46 Cal.4th 969, 95 Cal.Rptr.3d 588, 209 P.3d 923, 930 (2009). If the representative plaintiff prevails, the aggrieved employees are statutorily entitled to 25% of the civil penalties recovered while the LWDA is entitled to 75%. Cal. Lab.Code § 2699(i).

Urbino v. Orkin Servs. of California, Inc., 726 F.3d 1118, 1121 (9th Cir. 2013). Prior to Urbino, Ninth Circuit district courts differed on whether courts should aggregate PAGA penalties to calculate the amount in controversy under the diversity statute. See, e.g., Thomas v. Aetna Health of California, Inc., No. 1:10-CV-01906-AWI, 2011 WL 2173715, *19 (E.D. Cal. June 2, 2011) ("the amount at stake in a PAGA claim is predicated on the total amount of the penalties that can be sought by the aggrieved employees as the proxy of the LWDA"); Zator v. Sprint/United Mgmt. Co., No. 09-cv-2577-LAB MDD, 2011 WL 1168319, at *1 (S.D. Cal. Mar. 29, 2011) ("The claim by one plaintiff must satisfy the $75,000 amount in controversy requirement; the claims of other aggrieved employees cannot be aggregated to reach that threshold").

But in Urbino, the Ninth Circuit held that "the potential penalties" under PAGA are not "combined or aggregated" in calculating 28 U.S.C. § 1332(a)'s "amount in controversy" requirement. Id. at 1121; see also id. at 1122 ("[a]ggrieved employees have a host of claims available to them . . . [but] diversity jurisdiction does not lie because their claims cannot be aggregated"). The Urbino court reached this conclusion for two separate reasons. First, it held that a single plaintiff holds his rights "individually," not only as part of a group, and that "each employee suffers a unique injury." Id. Secondly, the court held that, even insofar as Urbino could be said to be bringing his claims on behalf of other workers, "[t]o the extent Plaintiff can—and does—assert anything but his individual interest, however, we are unpersuaded that such a suit, the primary benefit of which will inure to the state, satisfies the requirements of federal diversity jurisdiction." Id. at 1122-23. "The state, as the real party in interest, is not a 'citizen' for diversity

9

purposes." Id. at 1123 (citing Nav. Sav. Ass'n v. Lee, 446 U.S. 458, 461 (1980)).

BANA argues, however, that Garrett's claim alone meets the $75,000 requirement, and in the alternative, that the potential attorneys' fees in this action exceed the $75,000 requirement. The Court addresses each argument in turn.

### 1.    Garrett's Individual Recovery

"PAGA penalties are $100 for each initial violation and $200 for each subsequent violation." Allen v. Utiliquest, LLC, No. 13-cv-00049 SBA, 2013 WL 4033673, *7 (N.D. Cal. Aug. 1, 2013) (citations omitted). BANA does not dispute that the number of violations allegedly endured by Garrett herself cannot add up to more than $75,000 in statutory penalties. This would seem to be fatal to diversity jurisdiction after Urbino. However, BANA argues that this action is distinct from Urbino because:

> the Bank has not asserted the aggregation of civil penalties that other allegedly aggrieved employees might recover as the basis for establishing the amount in controversy. Rather, the Bank removed this action on the basis only of the amount of civil penalties that *Plaintiff individually* stands to recover. The amount in controversy for Plaintiff individually is well over $75,000 because Plaintiff might be entitled to recover for herself 25% of the total amount of civil penalties at issue, which would amount to approximately *$5,616,000*.

Opp'n at 7-8 (emphases in the original). BANA argues that PAGA is ambiguous as to the identity of the "aggrieved employees" who recover 25% of the total penalties. Opp'n. at 8. BANA contends that PAGA could be interpreted to consider *Garrett herself*, the representative plaintiff, to be the only "aggrieved employee," and that because she brought this action she herself might receive 25% of the total penalties. Id. at 9. As BANA reads Urbino, the Ninth Circuit decided only that the claims of *different* "aggrieved employees" are not aggregated, and did not consider the possibility that the representative plaintiff herself could be the only "aggrieved employee."

BANA's interpretation of both Urbino and PAGA are far-fetched. Its view of Urbino makes little sense, since John Urbino was the sole representative plaintiff in that case, just as Garrett is the sole representative here. 726 F.3d at 1121. Thus, BANA's argument applied to Urbino's claims would have rendered diversity jurisdiction proper – which is not the result the

United States District Court
Northern District of California

1    Ninth Circuit reached.[1]  It simply is not possible to apply BANA's construction of <u>Urbino</u> to that

2    same case, much less this one.

3         More fundamentally, BANA's argument rests on a mistaken interpretation of PAGA.

4    Garrett cannot receive 25% of all statutory penalties for herself personally.  PAGA creates the

5    "potential for *nonparty aggrieved employees* to benefit from a favorable judgment under the act."

6    <u>Arias v. Superior Court</u>, 46 Cal. 4th 969, 987 (2009) (emphasis added).  This is incompatible with

7    BANA's argument that the representative party in an action is the only "aggrieved employee."  In

8    describing PAGA, <u>Urbino</u> stated that "[i]f the representative plaintiff prevails, the aggrieved

9    employees are statutorily entitled to 25% of the civil penalties recovered," drawing a clear

10   distinction between plaintiff on one hand, and the employees as a group on the other.  726 F.3d at

11   1121.[2]

12        This authority is consistent with the Court's own statutory interpretation of PAGA.  PAGA

13   states that "civil penalties recovered by aggrieved *employees* shall be distributed as follows: 75

14   percent to the Labor and Workforce Development Agency ["LWDA"]. . . ; and 25 percent to the

15   aggrieved *employees*." Cal. Lab. Code § 2699 (emphases added).  PAGA further defines

16   "aggrieved employees" as "*any person* who was employed by the alleged violator and against

17   whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699 (emphasis

18   added).  This language indicates that all persons against whom a violation was committed, rather

19   than only the representative plaintiff who brings the action, recover a share of 25 percent of the

20   total penalties.

21        BANA attempts to create ambiguity where there is none by stating that subsection (g)(1) of

22   PAGA states "an aggrieved employee may recover the civil penalty described in subdivision (f)."

23   Opp'n. at 8.  This language does not contradict the subsections quoted above.  Subsection (f) states

24   the monetary amount of each penalty per violation that a defendant would have to pay.  Cal. Lab.

25   _____

26   [1] The total penalties at issue in <u>Urbino</u> for initial violations alone were $405,500, and so a 25%
     award would have brought Plaintiff Urbino over the amount-in-controversy threshold.  726 F.3d at

27   1121.
     [2] On BANA's reading, the Ninth Circuit would simply have written "if the representative plaintiff

28   prevails, he or she is statutorily entitled to 25% of the civil penalties recovered."

Code § 2699(f). Thus, it is fairer to say that (g)(1) indicates how to calculate the civil penalty each employee is allowed to recover, not the amount the employee bringing the suit is allowed to recover. If the latter were the case, the statute would at least state that the plaintiff bringing the suit "may recover the civil *penalties* described in subdivision (f)." This is not the case. Subsection (g)(1) further combines these penalties to state that 75% of this whole amount of recovery goes to the LWDA and 25% of the total recovery amount for all aggrieved employees goes to the aggrieved employees; presumably the same employees that the amount of penalties were calculated from. For these reasons, BANA's argument fails.

### 2.   Attorney's Fees

BANA argues that even if Garrett's recovery amount does not meet the amount in controversy, the attorney's fees would meet the $75,000 requirement. Opp'n. at 10.

> This court has affirmed the use of two separate methods for determining attorney's fees, depending on the case. In 'common-fund' cases where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method. The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). The Ninth Circuit has established that 25% is the benchmark award for attorney's fees in a common fund case. Id. However, "[i]n employment, civil rights and other injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof." Id. "The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate. . . . The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." Hanlon, 150 F.3d at 1029 (citations omitted).

For BANA to succeed under either distribution of attorneys' fees, it must show by a preponderance of the evidence that attorney's fees can be aggregated to reach the amount in controversy requirement.

### a.   25% Benchmark Calculation

United States District Court
Northern District of California

United States District Court
Northern District of California

1    BANA argues that the attorneys' fees in this action would presumptively be calculated as

2    25% of the total recovery, and therefore if the action succeeds on all of its claims, the amount of

3    attorney's fees is likely to be more than $5 million.  Opp'n. at 11.  Urbino did not directly address

4    the possibility that PAGA attorneys' fees could meet the "amount in controversy" requirement, so

5    the Court turns to Ninth Circuit authority regarding class action attorneys' fees for guidance.

6    Gibson v. Chrysler Corp. was a pre-CAFA class action under a state statute that allowed

7    for attorneys' fees.  261 F.3d 927, 942 (9th Cir. 2001), holding modified post-CAFA by Exxon

8    Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005).  Defendant Chrysler argued that the

9    entirety of potential attorneys' fees available under the California statute should be added to the

10   named plaintiffs' claims, bringing each named plaintiff over the amount-in-controversy

11   requirement.  The Gibson court rejected this argument.  Gibson analyzed the California statute at

12   issue and noted that it allowed attorneys' fees "to a successful party," as distinguished from an

13   award allowed under another statute that was allowed to "the *representative* parties."  "California

14   courts have stated that § 1021.5 awards are a 'bounty' for plaintiffs who successfully litigate in the

15   public interest[], but they have not held that this 'bounty' goes only to named plaintiffs in a class

16   action."  Gibson, 261 F.3d at 942.  "We therefore hold that, under this California law at least,

17   attorneys' fees are not awarded solely to the named plaintiffs in a class action, and that they

18   therefore cannot be allocated solely to those plaintiffs for purposes of amount in controversy."  Id.

19   at 942-43 (citations omitted).

20   Similarly here, PAGA attorney's fees are allowed to "[a]ny *employee* who prevails in any

21   action," not to the specific representative parties who bring the action.  Cal. Lab. Code §

22   2699(g)(1) (emphasis added).  For this reason, the Court concludes that the total possible

23   attorney's fees in this action are not allocated towards Plaintiff Garrett's claims for purposes of

24   considering the "amount in controversy" requirement.   At the very least, BANA has failed to meet

25   its burden to demonstrate otherwise.

26   Prior to Gibson, the Ninth Circuit held that defendants could not allocate attorney's fees so

27   as to evade an otherwise applicable deficit in the amount in controversy.  Goldberg v. CPC Int'l,

28   Inc., 678 F.2d 1365, 1367 (1982).  At that time, before CAFA, the law under Zahn v. Int'l Paper

1    Co. was that the "'matter in controversy' requirement" had to "be satisfied by each member of the

2    plaintiff class" in any class action.  414 U.S. 291, 292 (1973).  The Goldberg court reasoned that if

3    class members' claims could not be aggregated to meet the amount in controversy requirement,

4    attributing attorney's fees to the named plaintiff only would defeat the purpose of disallowing

5    claim aggregation in the first place.  678 F.2d at 1367.

6        Since CAFA altered the premise of Goldberg, its specific conclusion is no longer sound

7    but its logic remains valid.  When the rule is that claims are not aggregated (as the rule was then

8    for class actions under Zahn and as it is now for PAGA actions under Urbino), it "would seriously

9    undermine" the rule to allow attorney's fees to be allocated solely to a named plaintiff in

10   determining the amount in controversy.  Id.

11                          **b.      Lodestar**

12       It seems much more likely that any attorneys' fees would be allocated on a "common

13   fund" basis rather than lodestar.  In any case, for the same reasons discussed immediately *supra*,

14   even if a court used lodestar to determine the amount of attorney's fees, for "amount in

15   controversy" purposes, the amount of fees would be applied only to the named plaintiff's claims in

16   proportion to her share of the total recovery.  Under these circumstances, Garrett's attorney would

17   have to bill $374.4 million, and be awarded that amount by a court as a "reasonable" attorneys' fee

18   award, to meet the amount in controversy requirement.[3]

19       "[I]n cases where a plaintiff's state court complaint does not specify a particular amount of

20   damages, the removing defendant bears the burden of establishing, by a preponderance of the

21   evidence, that the amount in controversy exceeds [the statutory amount]."  Sanchez v.

22   Monumental Life Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996). [4]  "Under this burden, the defendant

23   must provide evidence establishing that it is 'more likely than not' that the amount in controversy

24   exceeds that amount.'"  Id.

25       Not every action that permits attorneys' fees can be removed from in federal court on the

26

27   [3] Total number of tellers (4,992) multiplied by the minimum $75,000 requirement.  Defendant's
     Notice of Removal at 12, ECF No. 1.

28   [4] $50,000 was the amount in controversy requirement at the time of the Sanchez decision.

United States District Court
Northern District of California

1    speculative possibility that an attorney could be awarded over $75,000 per claim.  That possibility

2    seems particularly speculative here.  Especially given the statutory presumption against removal,

3    the Court finds that BANA has failed to meet its burden of showing that is more likely than not

4    that the amount in controversy applicable to Plaintiff Garrett's claim exceeds $75,000.

5         **D.    Mass Action under CAFA**

6         BANA argued in its papers that this PAGA action qualifies as "mass action" under CAFA.

7    A mass action is "any civil action (except a civil action within the scope of section 1711(2)) in

8    which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground

9    that the plaintiffs' claims involve common questions of law or fact . . .."  28 U.S.C. §

10   1332(d)(11)(B)(i).  "[M]ass actions filed in state court that satisfy CAFA's requirements may be

11   removed to federal court, 28 U.S.C. § 1453, but federal jurisdiction in a mass action, unlike a class

12   action, 'shall exist only over those plaintiffs' whose claims individually satisfy the $75,000

13   amount in controversy requirement, § 1332(d)(11)(B)(i)."  Mississippi ex rel. Hood v. AU

14   Optronics Corp., ___ U.S. ___, 134 S. Ct. 736, 740 (2014) ("Hood").

15        In Hood, a unanimous United States Supreme Court recently determined that a public

16   attorney general action did not qualify as a "mass action" under CAFA.  Hood held that "because

17   the State of Mississippi is the only named plaintiff in the instant action, the case must be remanded

18   to state court."  Id. at 740.  Here, Garrett, the only named plaintiff, is bringing her claims in a

19   representative capacity on behalf of others who stand to benefit, just as the State of Mississippi

20   was in Hood.  California permits such actions to proceed as private attorney general actions rather

21   than be brought only by governmental officers, but there is no reason to think this distinction

22   makes any difference in the analysis.  Moreover, even to the extent the Court considered Garrett's

23   representative capacity, "the primary benefit of" a PAGA suit "inure[s] to the state," rather than to

24   numerous specific employees.  Urbino, 726 F.3d at 1122-23; see also Arias, 46 Cal. 4th 969, 986

25   (2009) ("[a]n employee plaintiff suing, as here, under the Labor Code Private Attorneys General

26   Act of 2004, does so as the proxy or agent of the state's labor law enforcement agencies").

27        At oral argument, BANA's counsel conceded that this basis for jurisdiction is no longer

28   viable after Hood.  Since this action does not meet the "100 persons or more" requirement, it is not

1  removable as a CAFA "mass action."  In addition, each "plaintiff" does not meet the $75,000

2  requirement to remove a mass action to federal court, for the same reasons discussed in the

3  diversity jurisdiction analysis *supra*.

4        **E.**      **Class Action under CAFA**

5        Finally, BANA argues that the suit qualifies as a removable "class action" under CAFA.

6        Class actions filed in state court that satisfy CAFA's requirements may be removed to

7  federal court, 28 U.S.C. § 1453, as long as the aggregate amount in controversy exceeds the $5

8  million requirement.  Hood, 134 S. Ct. 736, 740.  "[T]he term 'class action' means any civil action

9  filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of

10  judicial procedure authorizing an action to be brought by 1 or more representative persons as a

11  class action[.]"  28 U.S.C. § 1332(d)(1)(B).  Plaintiff did not file her suit as a class action, but

12  BANA argues that a PAGA suit is "similar" enough to a Rule 23 action to be considered a "class

13  action" under CAFA.  Opp'n. at 11.

14        After oral argument on the instant motion, the Ninth Circuit forcelosed this possibility in

15  Baumann v. Chase Investment Services Corp., ___ F.3d ___, Case No. 12-5564, 2014 WL 983587

16  (9th Cir. Mar. 13, 2014).  PAGA actions are not CAFA "class actions," and are not removable on

17  that ground.[5]

18  **IV.**      **CONCLUSION**

19        For the foregoing reasons, this Court concludes that BANA has failed to demonstrate that

20  this Court has subject-matter jurisdiction over this action.  Since this Court cannot exercise

21  / / /

22  / / /

23  / / /

24

25    [5]  The Court might ordinarily give the parties leave to file supplemental briefing to address later-

26  decided authority, but will not do so here for two reasons.  First, it is impossible to imagine that Defendant could make any argument to salvage this ground for removal after Baumann.  Second,

27  even before Baumann issued, this Court was persuaded by the rationale of other district courts that PAGA actions were not CAFA "class actions."  See, e.g., Sample v. Big Lots Stores, Inc., No. 10-

28  cv-03276 SBA, 2010 WL 4939992, at *3 (N.D. Cal. Nov. 30, 2010).

United States District Court
Northern District of California

subject- matter jurisdiction, it takes no action on BANA's Motion to Dismiss. This case is

REMANDED to the Alameda Superior Court for further proceedings.

**IT IS SO ORDERED.**

Dated: April 24, 2014

_____
                    JON S. TIGAR
                    United States District Judge